IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Case No. 03-cv-00824-MSK-CBS

KAREN A. ROULETTE,

      Plaintiff,

v.

ELAINE L. CHAO, Secretary of Labor,

      Defendant.

_____

**OPINION AND ORDER GRANTING, IN PART,
MOTION FOR SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to the Defendant's Motion for

Summary Judgment (**# 61**), the Plaintiff's response (**# 67**), and the Defendant's reply (**# 69**).

**BACKGROUND**

The following facts are undisputed, except where noted.  In August 1998, Ms. Roulette, a

black female, began employment as a Claims Examiner with the United States Department of

Labor's Office of Workers Compensation Programs ("OWCP").  One year later, Ms. Roulette

was promoted from grade level GS-7 to GS-9, and the following year, was promoted to GS-11,

then the highest possible grade for a Claims Examiner.  In October 2000, the Department of

Labor re-classified the position of Claims Examiner, making a grade level of GS-12 a

possibility.

In August 2001, Ms. Roulette was considered for a promotion to GS-12 by her direct

supervisor, James Wiatrolik, but Wiatrolik decided not to approve the promotion.  Although  Ms.

1

Roulette's performance had met the standards required of her as a GS-11, Wiatrolik  did not

believe she had demonstrated the ability to assume the responsibilities of a GS-12.  Wiatrolik

also refused promotions to GS-12 to two of the three other Claims Examiners under his

supervision-- an Asian male and a Hispanic female– while awarding a promotion to a white

female.

Ms. Roulette contends that the promotion to GS-12 was to be automatic for Examiners

who had served one year at GS-11, but the Defendant contends that automatic promotions were

approved only for employees who met the one-year criteria at the time the GS-12 level was

approved in October 2002, and that all subsequent promotions would be merit-based.  Ms.

Roulette responded to the promotional denial by filing a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC").  Ms. Roulette was reconsidered for the

promotion in February 2002, and this time, received the promotion to GS-12.

In September 2001, Wiatrolik orally admonished Ms. Roulette for including certain

materials from claimant files as part of her EEOC charge, in violation of the claimants' right to

privacy.  Ms. Roulette does not apparently dispute that she was admonished by Wiatrolik for

doing so, but does dispute the Defendant's contention that no record of that admonishment was

placed in her personnel file.  Ms. Roulette points out that a record of that admonishment was

kept in a personnel file maintained by the District Director Shirley Bridge.

On September 25, 2002, Ms. Roulette was reassigned to the Adjudication Unit under the

supervision of Kimberly Macklin.  Macklin had requested that Ms. Roulette be reassigned to the

unit, as the two had a positive working relationship.  Ms. Roulette contends that this transfer was

retaliation for her EEOC charge, even though she acknowledges that the position did not affect

2

her pay, benefits, or general job responsibilities.  Ms. Roulette does contend that the claims in the Adjudication Unit were "more complex" than those she had previously handled, and that she was given inadequate training to handle the new claims.  Three months later, Ms. Roulette was again reassigned, this time to the Medical Management Unit.  The Defendants contend that this transfer was also purely lateral, and did not materially alter Ms. Roulette's pay, benefits, or job responsibilities, but Ms. Roulette contends that the transfer saddled her with a disproportionately onerous caseload.

At approximately the same time, Ms. Roulette was subjected to an oral counseling by Macklin, who had felt threatened by Ms. Roulette as a result of a conversation in which Macklin understood Ms. Roulette to say that Macklin was "in [her] crosshairs."  Ms. Roulette denies that she made such a statement to Macklin, and points out that Macklin was not her supervisor at the time, and thus, not authorized to issue a counseling.  The following month, Macklin summarized the incident in a written confirmation of the oral admonishment, and sent it to several superiors, including Bridge.  The Defendants deny, however, that the written document was placed in Ms. Roulette's personnel file.

Also in December 2002, the OWCP withdrew the signature authority of all Claims Examiners.  Without such signature authority, Examiners are required to obtain approval of claims decisions by superiors rather than issuing the decisions themselves.  Ms. Roulette contends that this action, occurring closely in time to her transfer to the Medical Management Unit, raises an inference that it was in retaliation for her EEOC charge.  However, she does not dispute that the change affected all Claims Examiners, including those who had not filed charges.

3

On April 15, 2003, Ms. Roulette filed a complaint against Bridge and Macklin in Denver District Court, alleging that Macklin's December 2002 counseling regarding the "crosshairs" comment was defamatory.  The Defendants state that Ms. Roulette again attached information from claimant files to the complaint in violation of claimant privacy rights, and thus, on May 23, 2003, Bridge issued Ms. Roulette a formal written reprimand.  The Defendants contend that the letter did not result in any adverse consequences for Ms. Roulette, and that its effect expired by its own terms in 2004.

In May 2003, Ms. Roulette sent a series of e-mail messages to Defendant Chao, the Secretary of Labor, raising concerns about the alleged retaliation occurring in the OWCP.  On June 3, 2003, Bridge issued a written reprimand (although the Defendant refers to it as a "memo") to Ms. Roulette for abuse of the e-mail system, directing her not to involve the Secretary in a local office dispute.  Again, the Defendant contends that the memo was not placed in Ms. Roulette's official personnel file and did not result in any disciplinary action, while Ms. Roulette contends that a copy was maintained by Bridge in her own version of Ms. Roulette's personnel file.

On May 23, 2003, Ms. Roulette e-mailed her supervisor, Tom O'Melia, seeking assistance with a particular project.  O'Melia was on vacation at the time, and Bridge referred Ms. Roulette's request to Macklin, who was covering for O'Melia.  Macklin instructed Ms. Roulette to finish the project by the close of business on the following day, or risk discipline.  Ms. Roulette contends that this order from Macklin was arbitrary and retaliatory, and Ms. Roulette sought review of the directive from Acting District Director Nigel Strozier.  Strozier agreed with Macklin's directive and instructed Ms. Roulette to comply.  Although Ms. Roulette

did not ultimately complete the project as directed, she does not dispute that she was not disciplined as a result, and that her next performance evaluation by O'Melia was satisfactory.

At some point, Ms. Roulette began looking for other jobs, and a prospective employer contacted Bridge for a recommendation. Ms. Roulette does not appear to dispute that Bridge characterized the reference she gave as being "good," but seizes on the fact that, when asked what Ms. Roulette's worst trait was, Bridge responded that she wished Ms. Roulette was faster at processing her caseload. Ms. Roulette contends that this constitutes an adverse reference that was retaliatory.

Ms. Roulette's Third Amended Complaint **(# 46)** alleges two claims for relief: (i) discrimination on the basis of race and sex in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, relating to the initial denial of the promotion to GS-12; and (ii) retaliation for filing the EEOC charge in violation of Title VII. The Defendant then filed the instant motion for summary judgment **(# 61)**, asserting that Ms. Roulette could not establish the following elements: (i) on the discrimination claim, that she was qualified for the promotion to GS-12, that she was denied that promotion in circumstances giving rise to an inference of discrimination, and that Wiatrolik's proffered non-discriminatory reason for the denial is pretextual; and (ii) on the retaliation claim, that she suffered an adverse employment action, and that the proffered reasons for the challenged conduct are pretextual.

## JURISDICTION

The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## ANALYSIS

### A.  Standard of review

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Cattret*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F. 3d 567, 569 (10th Cir. 1994); *see also In re Ribozyme Pharmaceuticals, Inc. Securities Litigation*, 209 F. Supp.2d 1106 (D. Colo. 2002). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Stone v. Autoliv SAP, Inc*., 210 F. 3d 1132 (10th Cir. 2000); *Carry v. U.S. Postal Service*, 812 F.2d 621, 623 (10th Cir. 1987).   A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.  *Anderson*, 477 U.S. at 248.  The court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *Houston v. Nat'l General Ins. Co.,* 817 F. 2d 83, 85 (10th Cir. 1987); *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co*., 52 F.3d 1522, 1527 (10th Cir. 1995); *Grayson v. American Airlines, Inc.*, 803 F. 2d 1097, 1101 (10th Cir. 1986).

The analysis to be applied differs depending on whether the moving party is also the party with the burden of proof at trial.  Here, the Defendant challenges Ms. Roulette's ability to carry her burden of proof to establish the elements of her claims.  Because the non-movant bears the burden of proof at trial, the non-movant may not simply rest on her pleadings, but must

6

affirmatively present competent evidence to establish a genuine issue of fact with respect to every challenged element of her claim. *Ribozyme*, 209 F.Supp.2d at 1111; *Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002).

### B. Discrimination claim

Claims of discrimination under Title VII are examined under the familiar *McDonnell-Douglas* burden-shifting formula.  To prove a claim of discrimination under Title VII, Ms. Roulette must first establish a *prima facie* case that: (i) she is a member of a protected class; (ii) that she was qualified for the position she occupied or sought; (iii) that she suffered an adverse employment action; and (iv) that such adverse action occurred in circumstances giving rise to an inference of discrimination.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir.2004); *Martin v. Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1416-17 (10th Cir.1993).   If Ms. Roulette successfully carries this burden, the Defendant must produce a legitimate, non-discriminatory reason for its actions, and Ms. Roulette must then prove that the proffered reason is pretextual.  *Id.*

On the discrimination claim, the Defendant contends that Ms. Roulette cannot put on a *prima facie* case because she cannot demonstrate that she was qualified for the promotion to GS-12, or that the denial of such  promotion occurred in circumstances giving rise to an inference of discrimination.

Turning first to the issue of qualification, the Court notes that at the *prima facie* stage of the analysis, a plaintiff must only show that she met the objective qualifications necessary to perform the position.  *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193-94 (10th Cir. 2000).  Unfortunately, the record is not entirely clear as to what objective qualifications

were required to obtain the GS-12 position.  The parties agree that there was a requirement that the employee must have served a full year at GS-11, but they do not agree that this was the only requirement and that if satisfied, the employee would automatically be promoted. Ms. Roulette argues that promotion to GS-12 was to be automatic upon successful completion of a year at GS-11.  The Defendants submitted Bridge's affidavit, however,  that indicates that automatic promotion occurred only for those GS-11 employees who had served a full year at the time the promotion became available in October 2000, but that such a policy did not exist at the time of Ms. Roulette's consideration in August 2001. In addition, Bridge's deposition testimony was that, as of August 2001, the decision to promote Claims Examiners to GS-12 was "at the supervisor's discretion."

Ms. Roulette has come forward with evidence that would satisfy this element of the *prima facie* case.  The conflicting positions given by the parties as to the objective qualifications for promotion to GS-12 give rise to a factual dispute which is within the province of the jury to resolve.  A reasonable jury could conclude that Ms. Roulette's version of the facts is more accurate.

However, even if Ms. Roulette had been qualified for the promotion, to prove a prima facie claim of race discrimination, she must also present evidence to establish that the failure to promote her occurred in circumstances giving rise to an inference of discrimination.  Courts have found this element to be satisfied in a number of ways, including:

> actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus ..., preferential treatment given to employees outside the protected class ..., in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees ..., or a pattern of recommending the plaintiff for positions for which she is not qualified [or

> over-qualified] and failure to surface plaintiff's name for positions
> for which she is well-qualified. A plaintiff might also rely upon the
> fact that the defendant, following plaintiff's termination, continued
> to seek applicants to fill the position, ... or, more generally, upon
> the timing or sequence of events leading to plaintiff's termination.

*Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005).

Here, Ms. Roulette's only evidence of pretext is that she completed one year at GS-11;

she had previously received a satisfactory performance evaluation from Wiatrolik; and that only

a white female was promoted.  This evidence, considered individually or collectively, is

insufficient to raise the inference of race discrimination.  The mere fact that Ms. Roulette was

meeting (but apparently not exceeding) expectations as a GS-11 level employee does not suggest

that she should be promoted to GS-12; indeed, it suggests the opposite– that Ms. Roulette was

presently at a grade level consistent with her demonstrated performance.  Absent evidence

showing that promotion to GS-12 required nothing more that satisfactory performance as a GS-

11, Ms. Roulette's satisfactory performance at the lower level does not raise an inference that a

promotion should have been made.  Accordingly, the Court finds that Ms. Roulette's satisfactory

performance as a GS-11 does not raise an inference of discrimination from the fact that she was

not promoted to GS-12.

Ms. Roulette also points to the fact that Wiatrolik promoted a white female to GS-12 at

the same time denying Ms. Roulette's promotion.  This contention, of course, effectively

destroys that portion of Ms. Roulette's discrimination claim that is based on sex (as does the fact

that a similar promotion was denied to a male Examiner).  More importantly, however, the

record shows that other employees not in Ms. Roulette's protected class received similar

treatment; specifically, two non-black employees of similar seniority were also denied

promotions to GS-12.  Ms. Roulette selectively chooses to focus on the fact that all of the

employees denied promotions were "not white," ignoring the fact that they are also "not black";

that is, although they are also members of other protected classes under Title VII, they are all

outside Ms. Roulette's protected class.  The Court notes that nearly every formulation of the

*prima facie* case discussing the inference that arises from differential treatment compares a

plaintiff to employees "outside the [*i.e.* plaintiff's] protected class," not employees "outside any

protected class" or "unprotected" employees.  *See e.g. Plotke*, 405 F.3d at 1101, *quoting*

*Chertkova v. Connecticut Gen. Life Ins*., 92 F.3d 81, 91 (2d Cir.1996); *but see Kendrick v.*

*Penske Transportation Svcs. Inc.*, 220 F.3d 1220, 1226-29 (10th Cir. 2000) (using both

"nonprotected" and "outside the protected class" in discussing fourth element).[1]

　　Even assuming that there was some inference to be drawn from the fact that no non-white

Claims Examiner received a GS-12 promotion in August 2001, the value of that inference is

entirely diminished by the fact that Wiatrolik, the same decisionmaker who denied her the

promotion, had twice promoted Ms. Roulette in two previous years.  Ms. Roulette proffers no

explanation why Wiatrolik would repeatedly promote her and give her satisfactory evaluations,

---

[1]The Court gives the *Kendrick* holding and reasoning little weight in this circumstance. In *Kendrick*, the court was concerned with whether proof of dissimilar treatment of employees outside the protected class was necessary to satisfy the fourth element in discharge cases.  *See* 220 F.3d at 1228-29 ("as in a failure to hire case, a plaintiff alleging discriminatory discharge ordinarily need not show that a person outside of the protected class was hired to fill his former position in order to make out a prima facie case of discrimination").  The reasoning in *Kendrick* was specifically based on the fact that in discharge cases, proof of qualification coupled with the fact that the position continued to exist after the termination was sufficient to raise an inference of discrimination because "it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement."  *Id.* at 1229.  No such inference arises here, where the discriminatory act is a denial of promotion.  There is nothing inherently illogical about an employer denying a promotion to even an employee who may have the objective qualifications for it.

then suddenly reverse course and begin discriminating against her based on a characteristic she possessed throughout her employment.

Accordingly, the Court finds that Ms. Roulette has not met her burden of coming forward with sufficient facts to suggest that the August 2001 denial of promotion occurred under circumstances giving rise to an inference of discrimination.  Because Ms. Roulette cannot establish a *prima facie* case, the Defendant is entitled to summary judgment on the discrimination claim.

### C. Retaliation claim

To establish a claim of retaliation under Title VII, Ms. Roulette must first make a *prima facie* showing that: (i) she engaged in protected activity; (ii) she suffered an adverse employment action; and (iii) that there is a causal connection between the protected activity and the adverse action.  *Medina v. Income Support Division*, ___ F.3d ___, 2005 WL 1519061 (10th Cir. June 28, 2005), *citing Williams v. Rice*, 983 F.2d 177, 181 (10th Cir.1993).  The burden then shifts to the Defendant to offer a legitimate, non-retaliatory reason for the adverse action, and Ms. Roulette bears the burden of showing that reason to be pretextual.  *Id.*  Here, the Defendant contends that Ms. Roulette cannot establish any adverse employment action, and cannot establish that any proffered non-retaliatory reason is pretextual.

An adverse action must be "a significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir.2004).  Whether a particular incident constitutes an "adverse employment action" is determined on a case by case basis.  *Medina*, *supra*, *citing Heno v. Sprint/United Mgmt. Co.*, 208

F.3d 847, 857 (10th Cir. 2000).  However, an adverse employment action must be "materially

adverse," and a "mere inconvenience or an alteration of job responsibilities" will not suffice.  *Id.*,

*citing Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir.1998).  Disciplinary action by

employer can constitute adverse employment action, but such discipline must affects the terms

and conditions of employment by, for example, affecting the likelihood that the plaintiff will be

terminated, undermining the plaintiff's current position, or affecting the plaintiff's future

employment opportunities.  *Medina*, *supra.*, *citing  Roberts v. Roadway Express, Inc.*, 149 F.3d

1098, 1104 (10th Cir.1998).

 Ms. Roulette identifies several actions that she contends are sufficiently adverse: (i) the

September 2001 admonishment by Wiatrolik for privacy violations that was placed in Bridge's

version of Ms. Roulette's personnel file; (ii) her transfer to the Adjudication Unit, and later, to

the Medical Management Unit; (iii) her oral and subsequent written reprimand by Macklin

regarding the "crosshairs" comment; (iv) the withdrawal of signature authority; (v) the written

reprimand from Macklin in May 2003 for privacy violations; (vi) the June 2003 reprimand for e-

mail abuse; (vii) the "arbitrary" instructions from Macklin and Strozier to finish a project or risk

discipline; and (viii) the negative reference given by Macklin.  Of this list, several are clearly not

actions that can be considered adverse.  For example, the transfer of Ms. Roulette to the

Adjudication Unit, and later, to the Medical Management Unit, did not affect Ms. Roulette's pay,

benefits, or job responsibilities.  At best, they merely required her to develop a new set of skills

for dealing with complex claims or poorly-kept files.  This does not constitute an adverse action.

*See Tran v. Trustees of the State Colleges in Colorado*, 355 F.3d 1263, 1268 (10th Cir.2004)

("requiring an employee to develop new skills is not the kind of adversity that can support a

*prima facie* case of retaliation").  Likewise, the "arbitrary" instructions by her acting supervisors

to finish a project or face discipline do not constitute an adverse action, particularly where the

threatened discipline never materialized.  *See e.g. Dick v. Phone Directories Co.*, 397 F.3d 1256,

1268-69 (10th Cir. 2005) (affirming summary judgment against employee who claimed

unrealized threats of termination constituted adverse actions).  Ms. Roulette has not come

forward with any evidence to suggest that the single "negative" reference given to a prospective

employer was the reason she did not get the job.[2]  In these circumstances, she cannot show that

the reference had more than a *de minimis* effect on her employment prospects with that

employer.  *Hillig*, 381 F.3d at 1033.

Ms. Roulette was issued as many as four reprimands for various acts, and that despite the

Defendant's contention that such reprimands were not noted in Ms. Roulette's "official"

personnel file, they were kept in a personnel file maintained by Bridge.[3]  It is undisputed that

these admonishments did not result in any materially adverse consequences for Ms. Roulette,

insofar as she was never suspended, placed on probation, or otherwise experienced any apparent

consequences from them.  Thus, they likely would not constitute adverse actions under *Medina*.

However, the fact that memorializations of these admonishments continue to be retained in a

personnel file– even an "unofficial" one– suggest that there remains the possibility they could be

---

[2]The Defendant asserts that the hiring decision on the job Ms. Roulette sought was made by someone other than the person who called for the reference and that the reference given by Bridge was never conveyed to the decisionmaker.  Ms. Roulette does not dispute this assertion.

[3]The distinction between Ms. Roulette's "official" personnel file and the "unofficial" file maintained by Bridge is unclear.   The Court assumes that Bridge has the authority to discipline or terminate Ms. Roulette, and thus, records kept by Bridge to support such decisions would, for all practical purposes, be as "official" as those contained in a file in some remote Human Resources office.

used to support future discipline against Ms. Roulette. *C.f. Medina*, *supra*. ("the letter was not placed in Ms. Medina's personnel file"). So long as the possibility remains that the various reprimands could result in material consequences for Ms. Roulette, there is at least a question of fact as to whether they are "adverse," and thus, summary judgment is not appropriate.

Thus, the final question is whether Ms. Roulette has come forward with evidence to demonstrate that the Defendant's proffered non-retaliatory reasons for the four reprimands is a pretext for retaliation. Pretext is usually shown in one of three ways: (i) with evidence that the defendant's stated reason for the adverse employment action was false; (ii) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (iii) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. *Kendrick*, 220 F.3d at 1230. A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness. *Id.*

Here, Ms. Roulette has not come forward with any facts to suggest that the four reprimands were pretextual. Two of the instances, Wiatrolik's September 2001 warning and Macklin's May 2003 warning, involve accusations that Ms. Roulette disclosed claimant information in violation of privacy rules. Ms. Roulette does not dispute that she disclosed the information, nor does she point to instances in which other employees engaged in similar conduct and were not disciplined. Thus, she has not come forward with evidence to suggest that the Defendant's proffered explanation for those reprimands were pretextual. Similarly, with

regard to the reprimand she was issued for sending e-mails to the Secretary, Ms. Roulette has not disputed that she sent the e-mails, that doing so was in violation of some OWCP policy, or that if no such policy existed, that other employees who engaged in similar conduct were not similarly reprimanded.  Indeed, with regard to all three of these reprimands, Ms. Roulette's only argument in her response concerns whether the reprimands were placed in her personnel file or not.  Thus, Ms. Roulette has not demonstrated a genuine issue of fact with regard to whether these reprimands were pretextual.

That leaves only the reprimand relating to the "crosshairs" comment.  In this instance, Ms. Roulette denies having made the comment that caused Macklin to issue the reprimand.  Of course, the issue is not whether Ms. Roulette actually made the comment, but whether Macklin reasonably believed she heard a comment to that effect, and reasonably felt that such a comment constituted a threat warranting discipline.  Nevertheless, taking the facts in the light most favorable to Ms. Roulette, Ms. Roulette's assertion that she did not make the comment raises an issue of fact as to whether Macklin could reasonably believe that she heard such a comment.  A reasonable juror could find that, if Ms. Roulette never made any statement susceptible to Macklin's interpretation, the reprimand issued to Ms. Roulette was pretext for retaliation.  Thus, summary judgment is denied with respect to this single issue.

Finally, to the extent that it can be considered an adverse employment action, there is no dispute that signature authority was withdrawn from all Claims Examiners, not just Ms. Roulette, and that it was done based on Bridge's dissatisfaction with the quality of work by the Claims Examiners as a group.  Ms. Roulette has not raised any facts suggesting that this explanation is pretextual.

## CONCLUSION

Accordingly, the Defendant's Motion for Summary Judgment (**# 61**) is **GRANTED IN PART**, insofar as the Defendant is entitled to summary judgment on Ms. Roulette's first claim for relief, alleging discrimination on the basis of race and sex, and **DENIED IN PART**, insofar as there is a genuine issue of material fact as to whether the December 2001 reprimand of Ms. Roulette for the "crosshair" comment constitutes retaliation.  The retaliation claim will proceed to trial solely with regard to that alleged adverse action.

Dated this 25th day of August, 2005

**BY THE COURT:**

_____

Marcia S. Krieger
United States District Judge